## No. 16;016.

DUFFY ET AL. *v*. GROSS ET AL.

(214 P. [2d] 498)

Decided January 23, 1950.

Messrs. BURRIS & BUMGARDNER, for plaintiffs in error.

Mr. A. T. STEWART, Mr. WILLIAM L. LLOYD, for defendants in error.

*En Banc.*

MR. JUSTICE HOLLAND delivered the opinion of the court.

DEFENDANTS in error, as plaintiffs in the trial court, filed, on December 28, 1946, their complaint against plaintiffs in error for damages arising out of an automobile collision which occurred on the 23rd day of December, 1945, at about 11:15 P.M., at the intersection of Berkley and Danforth streets in the city of Pueblo, Colorado. Reference to parties is made as they appeared at the trial.

On October 30, 1947, a jury returned a verdict for plaintiff Albert Gross in the sum of $500 for automobile property damage, and a verdict for Myrtle Gross in the amount of $5,500 for personal injuries, on which judgments were entered. Motion for new trial was overruled and application for review on writ of error followed.

The evidence discloses that Myrtle Gross was driving an automobile belonging to her husband and coplaintiff, Albert Gross, in a southerly direction on Berkley at about 11:00 o'clock P.M., and at the intersection of Danforth there was a collision with an automobile being driven easterly on Danforth by defendant Donald Duffy. This automobile was owned by Peter Duffy, the driver's father. The ownership and family-car doctrine as it related to both cars involved was admitted.

Plaintiff Myrtle Gross testified that she was fifty-two years of age, was familiar with the intersection involved and she stated that on approaching the intersection, she looked to her right and left and proceeded across the street; there was nothing in sight and she had seen nothing until a car shot across the street in front of her; she had looked to her right and there was nothing coming at the time, and she saw no headlights of any cars approaching; she got into the intersection and a car shot through in front of her and she did not see it until it was passed her, "then bang, another car struck me, it sounded just like an explosion." Her car was struck back of the right-hand door and if there had been lights on the other car, she would have seen them because she looked in that direction; her car was

shoved across the street against the storm sewer where it stood until some man knocked on the door of the car and she opened it and asked him not to touch her; she could not talk very good, her face was caved in, the upper part of her mouth torn out and her teeth were all broken off, her chest was crushed in; she had a broken left hand across the bone in the back of the hand; her back was injured; she had a hole in her leg; that she was in the hospital from December 23, 1945 until January 7, 1946, and received operation on her face and mouth by Dr. De Rose and hand-injury treatment by Dr. Ley; broken teeth and broken bone were removed and the inside of her mouth behind her nose was sewed up and down across her upper lip; she lost sixteen teeth and has a scar across her upper lip; that the nerves of her mouth are impaired and she has to pull her lips down over her teeth; she testified further as to the pain and suffering; that she has a permanent injury to her left hand, and is unable to perform ordinary household duties with her left hand; that due to the injuries to her legs, she has fallen many times; that prior to the accident she worked in the assessor's office and had an outside earning capacity of approximately $500 a year; that since the injury she has had to spend two dollars per day for household help. She gave further testimony relative to the doctors and the various treatments, the cost of the hospitalization, medical care and drugs. About all of this there is little dispute.

At this point, it will be noted that there is no serious contention about plaintiff's injuries and the permanency thereof.

Fred A. Hegler, police officer of the City of Pueblo, answered the call, and he responded sometime between 10:30 and 11:00 o'clock P.M. He was accompanied by Officer Graf, who made the report. He talked with Donald Duffy at the time in the presence of officer Graf and they asked him to show his driver's license; Duffy said he had been following another car. He further

testified that there was a stop sign at Danforth and Berkley located on the southwest corner of the intersection, and that to comply with the stop sign, the driver proceeding east on Danforth in crossing Berkley would be required to stop.

On cross-examination, the officer was handed the original police report of the accident, and stated that he did not make it.

M. B. Graf, police officer, testified that he was a radio patrolman; that he investigated the accident at the time of the collision, talked with Donald Duffy, and asked him for a driver's license, which he had; that he asked him what his hurry was and Duffy said he was playing tag with some other car; that he prepared exhibit A, the police report, right after the accident, drew a diagram of the accident, and that the circles on the southwest corner of Danforth and the northeast corner of Danforth represent stop signs and were placed on the report immediately after the accident. On cross-examination, he stated that he did not know how the circles got there and that in response to the marking, "no control present," it could mean a lot of things, no lights, no stop lights or no officer present.

At this juncture considerable interrogation of the witness and argument back and forth between counsel concerning the police officer's report of the accident over the matter of, in one place, circles, indicated stop signs, and in another, under traffic control, which showed no traffic control. The request of defendants' counsel to have the testimony of officers Graf and Hegler stricken because the official report appeared to have been altered was denied by the court.

Perry Hanson, a witness for plaintiffs who resided about 100 feet from the intersection where the collision occurred, stated that he had lived there since January 17, 1944; that he did not see the accident or observe the stop sign on the night in question, but that on the following morning there was a stop sign on the southwest

corner of Danforth and that there had been one there before; he further stated that the reason he took particular notice concerning the stop sign was that on the next morning he was looking the situation over to see how the accident happened.

Albert Joseph Arraj, witness for plaintiffs, testified that he was service manager of the Colorado Motor Car Company; that he examined the Gross car after the collision; that the front grill was broken; cowl was pulled up and the front wheels were bent back under the car; that the frame was twisted; that the wheels were bent and the shock absorbers broken; transmission case broken; fly wheel housing broken; door of the tubes of the rear housing was bent; that the car looked to him to be beyond repair, and that the damage would run possibly five to six hundred dollars. He stated, in his opinion, that the injury to the Gross car showed a head-on collision.

Plaintiffs submitted testimony concerning plaintiff Myrtle Gross' physical condition and the hospital and medical treatments and expense.

Defendants' testimony as abstracted is substantially as follows: Frank G. Kolbezen testified that he was police court stenographer, and was familiar with police reports; he detailed the manner in which same were made and testified that there appeared to have been erasures on the reverse side of the report which had been pictures of the automobiles and that two little circles had been written in, in pencil, on the carbon side of the report.

Defendant Peter S. Duffy, owner of one of the cars involved in the collision, learned about the collision and went later to the scene of the accident particularly because the police report showed that the car driven by Donald Duffy, his son, had struck the Gross car broadside. He found all the damage to the Duffy car was to the left side of the car, fender had been rolled up, the door knob knocked off, windows broken on the left

side, and that there was no damage to the front end of the Duffy car at all; that the next morning, he and his wife went to the intersection, checked all the corners carefully and found no evidence of any stop signs.

Donald Duffy, driver of defendant Peter Duffy's car, testified in his own behalf that he was a student at the Pueblo Junior High School and that at the time of the collision, John and Tommy Titman and David Druva were passengers in his car; that he had been at the Titman home earlier in the evening; that the boys had gone in the car to get a soft drink and were returning to the Titman home when the accident occurred; that the lights of his car were burning as he approached Berkley street where he intended to turn right to the Titman residence; that there was no stop sign at this intersection; that there was a car traveling ahead of him approximately a block away; that he had been traveling behind this car for approximately three or four blocks; that he looked to the right on approaching Berkley and to the left and saw the headlights of the Gross automobile; that he was about twenty-five feet from the curb line when he first saw the headlights of the Gross car; that he was driving approximately thirty miles an hour; he slowed down to make the turn, and that he had not completed the turn into Berkley when the Gross car collided with his car, coming up along the left side of his, causing the door of his car to fall open; that he grabbed at the steering wheel to avoid falling out and this caused his car to turn to the left, cross the street, and go up over the curb on the opposite side of the street; he then went to the Gross car which was right up against the corner of the curb with the front bumper over the manhole cover; then returned to his car and noticed that the left rear, and the left front, fenders were dented; that glass on the left side was broken out of the door, and the handle was off the left door; that his car made skid marks for approximately seven feet

prior to the collision, caused by the application of his brakes. At the police station, he told the captain he had not been racing and the next morning he again looked at his car and the left side looked as if something had been dragged along the entire length of the car about the height of the fender; that that was about the only damage to his car; there was no damage to the front end of the car and the headlights were burning after the accident; that his car jumped the curb and the axle was bent in from the jar of hitting the curb; that the next morning he checked the intersection and there was no stop sign at the corner.

On cross-examination, he was asked if he had been playing tag with some other boys in an automobile and he replied that he had not; that he had not seen the other boys, who were mentioned by name. He further testified that he was somewhere in the vicinity of twenty feet from the intersection when he first saw headlights coming from a northerly direction on Berkley about thirty or forty feet from the intersection; that at the time of the collision, he had just entered the south bound lane of traffic on Berkley, was turned about ninety degrees around the turn to go south on Berkley and that the Gross car had hit the left rear fender and came all the way up the left side of his car; that when he was making the turn he was going at a speed of somewhere between ten and fifteen miles an hour; he denied that he had told the officers he was playing tag or racing another car.

Dr. Ley testified for plaintiffs that he saw Mrs. Gross as a patient December 24, 1945; that his examination disclosed that she had fractures of the second and third metacarpal bones, contusions of the right chest wall, contusions of the eyes and face, and contusions of the right knee; that she was in the hospital for twenty-three days and then was under his care until August 9, 1946.

The evidence of Ralph J. Marco, defendants' witness, was to the effect: That he had lived at the southwest

corner of the intersection involved for six years at the time of the accident; that he heard the noise caused by the collision, but·did not go out to the scene of the accident. He stated there was no stop sign at the intersection, and further stated that if there had been a stop sign facing the eastbound traffic on Danforth, it would have been on his property. On cross-examination, he stated there had been a stop sign at this intersection at sometime perhaps, but he did not know how long ago. On redirect examination, he testified that when he mowed his lawn, he used to work right up close to where the stop sign had been located.

John Titman, defendants' witness, testified in substance that he lived at 1422 Berkley, three-fourths of a block south of the intersection on the east side of the street; that he had lived there about eight years; that he knew there was no stop sign at the intersection on the night of the accident, but did not know whether there had ever been one there before that time or not; he stated he was nineteen years old and was riding with Donald Duffy the night the accident occurred, and was in the front seat with Donald; that after all four boys had gone to get a soft drink in the Duffy car they were driving back to his home and the lights were burning on Donald's car; that he could not estimate the speed at which Donald was driving; he saw the lights of the car approaching from the left on Berkley; he knew that they started to turn to the right up Berkley and this car struck them on the rear on the left-hand side; that the door of Donald's car flew open and Donald grabbed the steering wheel and pulled the car toward the left or east side ·of·the street and they went up on the curbing and the··car came to rest with its front end on the curb, and the Gross car was on the manhole of the curbing with the front bumper over the manhole; that the police arrived and did not ask him any questions; he recalled that they asked Donald for his driver's license and that was all.

Tom Titman, another passenger in the Duffy car, said he was fifteen years old, paid no attention to where they were going or what they were doing, and was quite scared; he stated there was no stop sign at the intersection.

Dr. W. T. H. Baker, witness for defendants, examined Mrs. Gross on May 3, 1946, and his testimony concerning his findings, is generally cumulative and in general sustains the medical testimony hereinbefore mentioned.

C. C. Knieseley, witness for defendants, testified that he made a survey of the intersection involved on February 8, giving the measurements of the streets involved and of the pertinent distances, and stated there was no obstruction at the intersection looking to the right from Berkley to the west and that one could see a block or so after passing the south wall of the house there located.

Counsel for plaintiffs in error have specified forty-one points as the basis of error for this review, which, for our purpose, we summarize as follows: That the competent and material evidence of plaintiffs is contrary to the physical facts and undisputed testimony of defendants; that the court erred in its rulings in the pre-trial conference, during the trial, and in the giving and refusing of certain instructions, especially the giving of instruction No. 17 regarding the plaintiff Myrtle Gross' lost capacity to do her household work as an element of damage; that error also was committed by the court at the pre-trial conference, in its refusal to require plaintiffs to state the specific ground of negligence on which they proposed to proceed at the trial, which request was renewed at the commencement of trial.

The record herein contains over 800 folios and only the highlights of the testimony have been hereinbefore set out. There seems to be little or no dispute concerning the personal injuries of plaintiff Myrtle Gross, resulting from the accident, or to the matter of the property damage to plaintiff's automobile. No issue was

made as to the judgments being excessive. Simply stated, the entire matter seems to rest on the question of liability under the circumstances, and much space is devoted, in the brief of plaintiffs in error relative to their being prejudiced as a result of the trial court's refusal to compel the plaintiffs at the pre-trial conference to state the specific grounds of negligence upon which they proposed to proceed at the trial.

It is our view that plaintiffs in error are in poor position to charge the trial court with an abuse of its discretion in its rulings at the pre-trial conference. The case was at issue prior to September 13, 1947, on which date the court set the cause for trial to a jury for Monday, October 20, 1947. The defendants had filed no motion for a bill of particulars, nor employed any other means to obtain a definite or particular statement of the items of alleged negligence prior to the date set for the trial. On October 20, plaintiffs appeared for trial as scheduled, but defendants' counsel sought continuance due to the fact that defendant Donald Duffy had failed to appear and was somewhere in California. The time for the trial had been well known to defendants for over thirty days, however, the trial court vacated the trial date and continued the trial for one week, to begin October 27 and ordered defendants to pay all costs attendant upon the continuance. At that time, on the motion of defendants, the pre-trial conference was ordered for 2:00 o'clock P.M. The proceedings at that conference centered largely around paragraph 3 of plaintiffs' complaint, which contained the allegations of negligence on the part of defendants, and is, in substance as follows: That on or about 11:15 o'clock P.M. on the 23rd day of December, 1945, at the intersection of Berkley and Danforth streets, Pueblo, Colorado, the defendant Donald Duffy negligently, carelessly and recklessly, and with a wanton and willful disregard of the safety and welfare of the public in general, and of the plaintiff Myrtle Gross in particular, drove and oper-

ated the automobile described in paragraph 2 into and upon the automobile described in paragraph 1, which was then and there being driven and operated by plaintiff Myrtle Gross.

Counsel for defendants requested the court to require plaintiffs to advise the court as to the acts of negligence upon which they were proposing to rely. Counsel for plaintiffs objected, and stated that the request was not proper; that it was a matter of proof and that this is a pre-trial conference to see what can be admitted; that they had alleged negligence, and defendants have denied it, so that is a question that is at issue.

"The Court: What do you want to know about paragraph 3?"

\* \* \*

"Mr. Burris: We want to know upon what theory of negligence they are proceeding, whether a violation of the city ordinances, excessive speed, failure to yield the right-of-way or what have you.

"Mr. Stewart: Let the record show that we refuse to give what you are asking.

"The Court: The court is going to overrule your request, I think you are going too far."

At the opening of the trial, which lasted four days, Mr. Lloyd, counsel for plaintiffs, in his opening statement to the jury said in substance: We expect to prove that there was a stop sign on Danforth at its intersection with Berkley. The testimony on the question of whether there was, or was not, a stop sign which defendant Donald Duffy failed to observe, is in sharp conflict and counsel for plaintiffs in error contend that their clients were seriously prejudiced by the ruling of the court in the pre-trial conference in not requiring plaintiffs to disclose this as one of their claims of negligence; they further insist that the trial court, not only in this instance, but generally, ignored the provisions of rule 16, Colorado Rules of Civil Procedure, concerning pre-trial conferences. If the decision of the trial

court in the pre-trial conference on this aspect of the case was prejudicial, as they claimed, plaintiffs in error did not make the best of some opportunity afforded them during the four days of the trial, because they were advised of this claim of negligence at the opening of the trial. The occasion was then presented for them to have moved for protection against this claimed surprise by seeking a continuance or asking for a recess to provide them an opportunity to meet the situation. This they did not do, but proceeded to trial, and presented testimony which sharply contradicted plaintiffs' evidence, indicating the presence or absence of the stop sign. In the original preparation of their defense, they should have been well aware of the existence or non-existence of the stop sign and been fully prepared to show, if possible, that their client was not violating any traffic regulation. However, on this question the defendants were fully guarded by instruction No. 14, given by the court, which is as follows: "The Court instructs the Jury that in order for the plaintiffs to prevail in this action upon the alleged violation of a traffic ordinance by reason of the failure of Donald Duffy to observe a through-street or a stop-sign at the intersection of Danforth and Berkley before entering said intersection, you must find by a preponderance of the evidence that Berkley Avenue at such intersection was, in fact, designated as a through-street or as a stop-street and that there was a stop-sign in place at the time of the accident against eastbound traffic crossing Berkley at such intersection."

As before stated, on this question there was sharp conflict in the testimony which was resolved against the defendants by the jury. From all of these circumstances, we do not see wherein the defendants were prejudiced by the ruling of the trial court in the pre-trial conference. Further discussion of the failure of the court to compel plaintiffs to disclose the specific acts of negligence upon which they relied, and which

is the real basis of this assignment of error, is not necessary other than to say that the pre-trial conference rule is designed to expedite trials when certain facts may be admitted and the necessity of proof thereof obviated. The proper courtesy of the profession enables this to be done, usually in a few moments at the beginning of a trial, without pre-trial conference. Usually, obvious facts are admitted, but we see nothing in the rule that is compulsory as to the disclosure of the details of the issues to be made by the pleadings. As to whether or not a pre-trial conference is to be called, rests entirely in the discretion of the trial court and that discretion abides throughout the procedure.

Objection was made to instruction No. 17, given by the court, which is: "* * * In determining such reasonable damages, you may take into consideration the bodily and mental pain which she has suffered, now suffers, and will continue to suffer, her facial disfigurement, the impairment of her earning capacity, if any, the medical, surgery and hospital expenses, and her inability, if any, to perform her usual duties as housewife. In short, you may award her such an amount as will reasonably and fairly compensate her for the injuries and damages she sustained as a proximate cause of the injuries resulting from the negligence of the defendants, not to exceed $19,150.00." The ground of the objection was that the jury was allowed to consider the impairment of Myrtle Gross' ability to perform her usual household duties as housewife. It is to be remembered that she had outside activities from which she received substantial income; that she received permanent injury to her left hand and arm; and wide latitude is allowed for the introduction of evidence that will aid in determining the extent of damage, and the nature, character and extent of the injuries. "A married woman is entitled to recover damages for the impairment of her ability to labor, independently of the husband's right

to recover for the loss of her time." *Colorado Springs Co. v. Nichols,* 41 Colo. 272, 92 Pac. 691.

Other specified errors are not of sufficient merit to warrant a disturbance of the verdict of the jury, which was properly instructed. The fairness of the verdict met the approval of the trial court .as is evidenced by its refusal to grant a new trial.

Judgments affirmed.